**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON**

| | |
|---|---|
| **LOGAN IMBER,**<br>WHITTAKER LAW, LLC<br>2055 Reading Road, Suite 260<br>Cincinnati, Ohio 45202<br><br>　　**Plaintiff,**<br><br>**v.**<br><br>**THE CITY OF COVINGTON, KENTUCKY,**<br>c/o City Solicitor Frank Schultz<br>20 West Pike Street<br>Covington, Kentucky 41011<br><br>**and**<br><br>**MANDIE APPLEMAN,**<br>**individually and in her official**<br>**capacity as a police officer acting**<br>**under color of state law,**<br>1 Police Memorial Drive<br>Covington, Kentucky 41014.<br><br>and<br><br>**KENZY HOTALING, individually**<br>**and in her official capacity as a**<br>**police officer acting under color**<br>**of state law,**<br>1 Police Memorial Drive<br>Covington, Kentucky 41014.<br><br>and<br><br><br><br><br><br><br>**ZACHARY STAYTON, individually**<br>**and in his official capacity as a** | **Case No.:** _____<br><br>**Judge:** _____ |

| | |
|---|---|
| **police officer acting under color** | ) |
| **of state law,** | ) |
| 1 Police Memorial Drive | ) |
| Covington, Kentucky 41014. | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## COMPLAINT AND JURY DEMAND

**COMES NOW**, Plaintiff **LOGAN IMBER**, by and through counsel, and for her Complaint and Jury Demand against Defendants the **CITY OF COVINGTON, KENTUCKY**, and **POLICE SPECIALIST MANDIE APPLEMAN,** and **POLICE OFFICER KENZY HOTALING**, and **POLICE SPECIALIST ZACHARY STAYTON**, individually and in their capacities as public officials acting under color of state law, alleges as follows:

### NATURE OF THIS CASE

1.    Plaintiff Logan Imber initiates this civil action against Defendants, Kenzy Hotaling, Zachary Stayton, and Mandie Appleman (collectively, the "Officer Defendants" unless otherwise indicated), individually and in their capacities as police officers acting under color of state law, under 42 U.S.C. §1983 ("Section 1983"), for (a) using unlawful and excessive force against her on July 17, 2025, when affecting her arrest on the John A. Roebling Suspension Bridge ("the Bridge") spanning the Ohio River between Cincinnati, Ohio and Covington ("the Incident"); and (d) under the First Amendment for retaliating against her with gratuitous violence when she objected to unlawful conduct by the police.

2.     The acts and omissions of the Officer Defendants alleged in this Complaint amount to violations of Plaintiff's clearly established right arising under the Fourth Amendment to the United States Constitution, and otherwise deprived her of her privileges, immunities, and rights arising under the United States Constitution, and secured by federal law.  Plaintiff also proceeds against the Officer Defendants personally for the torts of IIED and NIED arising under the law of the Commonwealth.

3.     Finally, Plaintiff proceeds against the City of Covington, Kentucky, in its own right under Section 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny for approving, adopting, ratifying, and/or endorsing the unlawful and unconstitutional conduct of the Officer Defendants pursuant to its policies, procedures, and customs, which were the driving force behind the acts and omissions of the Officers which underpin this Complaint, and for its failure to adequately train and supervise them.

4.     By this civil action, Plaintiff seeks relief in the form of compensatory damages, equitable relief, injunctive relief, statutory relief, damages for emotional distress and psychological injuries, punitive damages, reimbursement of her attorney's fees and costs, and all other relief to which she's entitled in law and equity, in excess of the jurisdictional threshold of this Court.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff incorporates the allegations in the preceding paragraphs of this Complaint as if fully rewritten.

6.      At all times relevant to this Complaint, Plaintiff Logan Imber has resided in Hamilton County, Ohio.

7.      At all times relevant to this Complaint, the City of Covington, Kentucky ("the City") has been a home-rule class municipality located in Kenton County, Kentucky.

8.      At all times relevant to this Complaint, the Officer Defendants have been, on information and belief, residents of Kenton County, Kentucky, and police officers employed by the City of Covington.

9.      his Court has personal jurisdiction over the parties to this action and subject matter jurisdiction over the controversy alleged in this Complaint under 28 U.S.C. §1331 based on the federal questions presented, and under 28 U.S.C. §1367 based on the Court's supplemental jurisdiction over Plaintiff's claims arising under the laws of the Commonwealth of Kentucky as part of the same case and controversy as her claims arising under federal law.

10.     The United States District Court for the Eastern District of Kentucky at Covington is the appropriate venue for this civil action under 28 U.S.C. §1391.

**FACTS**

11.     Plaintiff incorporates the allegations in the preceding paragraphs of this Complaint as if fully rewritten.

12.     The conclusive events relevant to this Complaint took place on the Bridge on a muggy July 17, 2025, evening between about 8:00 p.m. and 8:30 p.m. during the Incident described in this Complaint.

13. The Incident involved 48 sworn officers of the City of Covington Police Department ("CPD") and reinforcements from neighboring jurisdictions. As will be more thoroughly discussed below in this Complaint, the Incident involved 200 or so citizens peacefully marching across the Bridge after attending an interfaith vigil across the River in Cincinnati. Upon nearing the Kentucky side of the Bridge, the observers were confronted by CPD officers, including without limitation, Defendants Appleman, Hotaling, and Stayton, as well as non-parties to this civil action, Sgt. Robert Fain, upon information and belief, Stayton's trainee, Officer Terrell Meadows.

14. Plaintiff Logan Imber is depicted in **Image No.1** below, standing in the dress she wore that evening, feet from the arrest of Brandon Hill:



15. As part of CPD's initially measured response that evening, Sgt. Fain had arrived moments earlier in his cruiser. When he arrived, Fain issued dispersal orders

over his cruiser's PA system but quickly realized that the observers simply couldn't hear him, and there was no ready way to exit the roadway to the walkway without traversing the Bridge's structural elements. Bottlenecks resulted. Eventually, Sgt. Fain stopped using his PA system and began "going individually to people, telling them to get on the sidewalk."

16. Stayton is the officer in shorts kneeling on Brandon Hill in Image No.1. Upon information and belief, the officer next to Stayton is Officer Meadows. Officer Hotaling is the person in the background with blonde hair. Sgt. Fain is depicted behind Logan, physically steadying her and urging her across the cable barrier, as she wound through, over, and under the cabling.

17. Because the other side of the Bridge was more chaotic, seconds earlier, Logan crossed the roadway to find an easier path to the walkway. Upon reaching roughly the same point depicted above (but on the other side of the cabling), she observed Brandon Hill being repeatedly punched in the head by Officer Stayton.

18. There's no dispute that Logan emphatically objected to Fain and Stayton about Stayton's treatment of Hill, both vocally and by gesture.

19. There's also no dispute that when she reached the steel ledge separating the roadway from the cabling, which itself separates the walkway, she'd complied with Fain's dispersal order.

20. This is because, as discussed above, Sgt. Fain's "Plan B," springing from the bottleneck, was to at least get people out of the roadway and onto the ledge even

if they couldn't readily make it to the walkway. Thus, as long as people were on the ledge and ***staying*** there, they were compliant with Sgt. Fain's orders.

21.     When Logan first reached Sgt. Fain, he told her to "stop" and physically restrained her from reaching the walkway. He neither used a weapon nor threw a strike upon Logan. Rather, he used his training and experience to easily distance Logan from where he did not want her to go.

22.     Officer Hotaling and Specialist Appleman then came to assist Sgt. Fain. Officer Hotaling then deployed her Taser against Logan. By her account, the Taser was "ineffective." Specialist Appleman then deployed her own Taser next. It was, in her words, only "partially effective." She therefore redeployed it.

23.     The scene the officers created was so chaotic that Specialist Stayton, Specialist Appleman, and Officer Meadows were each accidentally tased by their fellow officers' weapons that evening.

24.     Specialist Stayton then joined Appleman, Fain, and Hotaling and pulled Logan's arm off the cables, grabbed her by her hair, pulled her to the ground by her hair, and placed his knee on her back as depicted in Image No.2:



25.    Sergeant Fain took control of Logan's legs, placing his body weight on them.  As Sergeant Fain later told the City's Internal Affairs investigators, Logan was unable to move her lower body, and he did not believe she was thrashing around. Nor could she with Fain and Stayton physically restraining her.

26.    Logan now lay face down on the sidewalk, restrained by five officers, while non-parties, Specialist Olvera-Vancini and Lieutenant Haubner, stood guard against the crowd.  CPD's Internal Affairs Unit later determined that "she was effectively restrained by multiple officers."

27.    Specialist Stayton, however, then punched Logan in the head.  In his own use-of-force report, he wrote: "Due to her continued resistance and failure to

comply, I delivered a closed-fist strike to the side of her head in an attempt to gain compliance." Multiple body-worn cameras corroborate the strike. The officers then handcuffed Logan.

28. Once Logan was handcuffed, Specialist Stayton grasped a fistful of her hair at the top of her head, told her to "[s]hut the fuck up," and pushed her head and face into the sidewalk. Body-worn camera footage captured this, and civilian-recorded video corroborates it.

29. In his Internal Affairs interview, Specialist Stayton claimed that he pushed Logan's head down because he believed she was attempting to lift herself. No other officer present reported any such thing. And as Internal Affairs observed, Logan was handcuffed: even if she lifted her head, "she was unable to stand or move in a significant manner."

30. Specialist Stayton himself later admitted to Internal Affairs that he "probably shouldn't have" pushed Logan's head down.

31. Logan was not drinking or using drugs at the time of the Incident. Nor was she intoxicated or otherwise under the influence of alcohol or drugs.

32. Logan was arrested and charged with Riot in the First Degree, Unlawful Assembly, Failure to Disperse, Resisting Arrest, Disorderly Conduct in the Second Degree, and Obstruction/Interference with an Officer.

33. The City of Covington is the largest municipality in Kenton County and Northern Kentucky, and one of two county seats. It is the fifth-largest municipality in the Commonwealth. As of the filing of this Complaint, the City is governed by

Mayor Ronald L. Washington and four Commissioners and was so governed on the evening of July 17, 2025. The City maintains, funds, and operates eight municipal departments, of which CPD is the largest, with over 114 sworn officers.

34. CPD is currently under the leadership of Chief Col. Justin Wietholther, a 20-year veteran of the department. Before ascending to his current office, Chief Wietholter served as CPD's Assistant Chief of Operations. In this executive role, he oversaw the Patrol, Criminal Investigations, and Strategic Services bureaus, as well as the CPD SWAT team.

35. At the time of the Incident, however, CPD was helmed by former Chief Brian Valenti, who retired after 30 years on August 1, 2025.

36. CPD's official policies and procedures lie in its General Orders, Standard Operating Procedures, and various manuals for everyday operations. They are updated regularly.

37. Specialist Stayton has been a CPD officer since 2021. He is an Army veteran and Covington native. On the night of the Incident, the City had entrusted him with serving as a field training officer ("FTO"), responsible for training a new officer, Officer Meadows, who accompanied him on the Bridge. Specialist Stayton's CPD "Guardian" personnel file contains two entries of significance: (a) a February 15, 2023, entry documenting "[c]oaching and mentoring regarding the use and positioning of empty-hand strikes," and (b) a June 1, 2023, entry documenting "[c]oaching and mentoring regarding maintaining control of a suspect by holding their hair."

38.    Officer Hotaling joined CPD in 2023. She's also a military veteran with five years of service in the National Guard.

39.    Officer Appleman joined CPD in 2022.

40.    The day after the Incident, on July 18, 2025, former Chief Valenti directed CPD's Internal Affairs Unit to investigate "all of the events that unfolded on the Roebling Suspension Bridge on July 17, 2025, … to include the entirety of the responses by Covington Police Officers." The Internal Affairs team reviewed approximately 116 body-worn camera videos, Taser logs, department reports and citations, approximately 2.07 gigabytes of open-source video and photographs and conducted numerous witness and officer interviews.

41.    On October 6, 2025, Internal Affairs issued its Finding of Fact. It concluded that the department's overall response was "within policy, legally justified, and reasonable" — but it sustained two violations of CPD Rule 141(A) (Use of Force) against Specialist Stayton for the closed-fist strike he delivered to Logan's head while she was restrained and for pushing her head into the sidewalk after she was handcuffed, and a separate violation of Rule 102 (Unbecoming Conduct) against him for cursing at and repeatedly shoving yet another woman on the Bridge.

42.    Internal Affairs didn't separately evaluate Officer Hotaling's or Specialist Appleman's uses of force against Logan.

43.    For the sustained violations arising from his treatment of Logan and one other woman on the Bridge, the City suspended Specialist Stayton for thirty days without pay. Specialist Stayton accepted that discipline in a written Suspension

Order dated October 29, 2025, which he consented to avoid a formal hearing. In that Order, the City found, in its own words, that Specialist Stayton "failed to de-escalate once the threat of further assault or injury had been mitigated."

44.    Nothing in this Complaint challenges the lawfulness of Logan's arrest.

45.    The force at issue in this Complaint was used against Logan while she lay face down and immobilized under the weight of five officers, and after she was handcuffed — force that the City's own Internal Affairs Unit found excessive precisely because she was restrained when it was used, a finding that Stayton knowingly and intelligently stipulated to.

## CAUSES OF ACTION

### Count I
### 42 U.S.C. §1983: Unlawful and Excessive Force, Violation of the Fourth Amendment

46.    Plaintiff incorporates and realleges the allegations in the preceding paragraphs of this Complaint as if fully rewritten.

47.    The Officer Defendants are state actors subject to suit under 42 U.S.C. § 1983, which provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

48.    The Fourth Amendment protects against the use of excessive or unreasonable force in the course of an arrest or investigatory stop.

49. Fain's encounter with Logan, which precipitated the underlying Incident, began lawfully. It remained lawful exactly as long as it remained in Sergeant Fain's hands.

50. Sgt. Fain began his service in CPD in the 2000s. During his initial tenure, Fain served across the Bike Patrol unit, as a Field Training Officer, and as a Domestic Violence Abuse Response Team detective. He retired days after the Incident on August 1, 2025, but was rehired as a retiree-rehire on November 3, 2026.

51. Of the police officers involved with Logan's arrest, Sgt. Fain is the most senior. His actions during the Incident were measured and lawful and reflect his training and experience and are what effective policing looks like.

52. Fain's actions are the baseline for how a reasonable officer would and should have acted under the totality of the circumstances.

53. What *followed* as described in this Complaint, was not measured or reasonable force under the totality of the circumstances because (a) Logan hadn't committed a serious offense; (b) she posed no threat whatsoever to the Officers, their fellow officers, or bystanders as made plain by Sgt Fain's restraint of her; and (c) she was neither actively resistant nor any risk to evade arrest by flight.

54. None of this was new to Specialist Stayton. His CPD Guardian file contains a February 15, 2023, entry for "[c]oaching and mentoring regarding the use and positioning of empty-hand strikes," and a June 1, 2023, entry for "[c]oaching and mentoring regarding maintaining control of a suspect by holding their hair." Twice counseled, he did both anyway.

55.    Under the totality of the circumstances, and even accounting for the split-second decisions police officers must make in tense, uncertain, and rapidly evolving situations, the force used against Logan was objectively unreasonable because: (a) the misdemeanor offense of resisting arrest is not a serious offense; (b) pinned face down under the weight of five officers, she posed no threat to anyone; (c) at the moment the force at issue in this Complaint was used, Logan was restrained and unable to move — the senior officer holding her legs did not believe she was thrashing, and the Internal Affairs investigation confirmed it; and (d) she posed no risk of evading arrest by flight.

56.    No exigency justified punching a pinned woman in the head or driving a handcuffed woman's face into the sidewalk by her hair.

57.    Officer Hotaling and Specialist Appleman were hands-on, inches away, actively restraining Logan when Specialist Stayton struck her, and they were present when he drove Logan's face into the sidewalk after she was cuffed.  Each had the opportunity and the means to intervene and prevent a fellow officer's unlawful use of force against a restrained woman.  Neither did.

58.    Each Officer Defendant's failure to intervene in Specialist Stayton's uses of force independently violated Logan's Fourth Amendment rights.  By doing so, the Officer Defendants deprived Logan of rights secured by the United States Constitution and the laws of the United States, and they knew or should have known that their conduct violated her clearly established Fourth Amendment rights to be free from excessive force and to have officers intervene to prevent it.

59.    As a direct and proximate result of the Officer Defendants' use of excessive force against Logan in violation of her clearly established Fourth Amendment rights as described in this Complaint, Logan has suffered compensable constitutional harm, injuries, and damages in excess of the jurisdictional threshold of this Court, including, without limitation, damages for emotional distress and psychological injury, physical injuries and pain, out-of-pocket medical expenses, loss of enjoyment of life, and such other monetary damages as the trier of fact may determine.

## Count II
## 42 U.S.C. §1983: Monell Liability

60.    Plaintiff incorporates and realleges the preceding paragraphs of this Complaint as if fully rewritten.

61.    Not only did the Officer Defendants know all of the above, but the City thoroughly investigated this Incident as described in this Complaint.  Neither Officer Hotaling nor Specialist Appleman was disciplined for her conduct.  Specialist Stayton, for his part, received a thirty-day unpaid suspension by written order dated October 29, 2025 — and was then returned to duty.

62.    The City did not merely tolerate the officers' actions — it agreed with, adopted, and endorsed them as a matter of official policy and procedure.

63.    The Officer Defendants' use of force against Logan need not be part of a broader pattern to establish the City's liability under Monell.  Where, as here, an official with final policymaking authority over CPD discipline reviews an officer's

conduct and declines to discipline her, that ratification is itself an act of municipal policy for which the City is liable.

64.    The constitutional injury Logan suffered stems directly from that ratification.  Acting through its Chief of Police and other officials vested with final authority over the discipline of CPD officers, the City adopted the officers' use of force as its own official act when it reviewed their conduct and chose not to discipline them.

65.    The City is therefore liable in its own right under Section 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because the City's ratification of the officers' conduct — through officials with final decision-making authority acting in their official capacities — was itself the moving force behind the deprivation of Logan's Fourth Amendment rights.

66.    Independent of that ratification, the City is also liable for the acts and omissions of its officials with final decision-making authority who, as a matter of policy or custom, tolerated, endorsed, and acquiesced in the violation of Logan's Fourth Amendment rights through the City's negligent or deliberately indifferent:

      a.     Hiring and retaining the Officer Defendants;

      b.     Failing to properly train the Officer Defendants;

      c.     Failing to properly supervise the Officer Defendants; and

      d.     Failing to discipline and correct the unlawful acts and omissions of the Officer Defendants described in this Complaint.

67.    But for the City's ratification, adoption, and endorsement of the Officer Defendants' unlawful and unconstitutional conduct as a matter of policy, procedure,

and custom — the driving and motivating force behind it — Logan would not have been subjected to the deprivation of her clearly established rights under the Fourth Amendment, as secured by federal law.

68.     As a direct and proximate result of the City's independent acts and omissions alleged in this Complaint, Logan has suffered compensable constitutional harm, injuries, and damages in excess of the jurisdictional threshold of this Court, including, without limitation, damages for emotional distress and psychological injury, physical injuries and pain, out-of-pocket medical expenses, loss of enjoyment of life, and such other monetary damages as the trier of fact may determine.

### <u>Count III</u>
### Violation of 42 U.S.C. §1983: First Amendment Retaliation

69.     Plaintiff incorporates and realleges the preceding paragraphs of this Complaint as if fully rewritten.

70.     On July 17, 2025, Logan was engaged in activity at the core of the First Amendment's protections: she was present at a public demonstration concerning a matter of public concern, i.e., the treatment of detainees in federal custody.

71.     The First Amendment also protects the right to observe and to voice opposition to the conduct of police officers performing their duties in public — including verbal criticism and challenge directed at the officers themselves.

72.     Logan's *vocal* opposition to the Officers' violent arrest of a fellow observer, unfolding feet away from her in front of the assembled crowd, was a protected expression.

73. Logan continued to speak after she was taken to the ground and after she was handcuffed and continued to object to the Officers' conduct.

74. Specialist Stayton's response to that speech is captured on video: he grasped a fistful of Logan's hair, told her to "[s]hut the fuck up," and pushed her head and face into the sidewalk.

75. In his own words, Stayton used force on a handcuffed woman for the express purpose of silencing her and is direct evidence that his use of force in that regard was motivated, at least in part, by Logan's protected expression.

76. Imposing gratuitous violence upon a subdued detainee not only violates the Fourth Amendment but is also a materially adverse act inflicted on Logan under the First Amendment. Gratuitous violence upon a defenseless speaker under the control of agents and officers of the Commonwealth would deter a person of ordinary firmness from continuing to exercise her First Amendment rights. This claim does not challenge Logan's arrest, any conviction, or the Officers' authority to take her into custody; it challenges only the force Specialist Stayton used to silence her after she was restrained.

77. As a direct and proximate result of Specialist Stayton's retaliation against Logan for the exercise of her clearly established First Amendment rights to object to and criticize public officials, including police officers, Logan has suffered compensable constitutional harm, injuries, and damages in excess of the jurisdictional threshold of this Court, including, without limitation, damages for emotional distress and psychological injury, physical injuries and pain, out-of-pocket

medical expenses, loss of enjoyment of life, and such other monetary damages as the trier of fact may determine.

## Count IV
### Intentional Infliction of Emotional Distress

78.    Plaintiff incorporates and realleges the preceding paragraphs of this Complaint as if fully rewritten.

79.    As described in this Complaint, the Officer Defendants engaged in intentional and/or reckless conduct toward Logan.

80.    This conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality by exercising gratuitous violence upon Logan while acting under the official powers of their offices and under color of state law.

81.    As a direct and proximate result, the conduct of the Officer Defendants described in this Complaint caused (and causes) Logan severe and serious emotional distress, humiliation, mental anguish and suffering, psychological injuries, and damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## Count V
### Negligent Infliction of Emotional Distress

82.    Plaintiff incorporates and realleges the preceding paragraphs of this Complaint as if fully rewritten.

83.    Alternatively, as alleged in this Complaint, the Officer Defendants were negligent in their acts and omissions.

84.     As alleged throughout this Complaint, the Officer Defendants made unwanted physical contact and impact upon Logan, which has caused her severe emotional distress and psychological injuries.

85.     As a direct and proximate result of the negligent infliction of emotional distress inflicted upon Logan by the Officer Defendants, she has suffered compensable injury and damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Logan Imber prays for judgment against Defendants, Officer Kenzy Hotaling, Specialist Zachary Stayton, and Specialist Mandie Appleman, individually and in their capacities as police officers and public officials acting under color of State law, and the City of Covington, Kentucky, in its own right, as follows:

A.     Compensatory damages and out-of-pocket medical expenses;

B.     Equitable relief;

C.     Damages for emotional distress and psychological injuries;

D.     Statutory damages;

E.     Pre- and post-judgment interest on damages is allowable;

F.     Injunctive relief;

G.     An award of her reasonable attorney's fees and costs;

H.     An award of punitive damages; and

I.      Such other relief the Court deems appropriate in excess of its jurisdictional threshold.

**DATED: July 17, 2026.**

Respectfully submitted,

*/s/Justin M. Whittaker*_____

Justin M. Whittaker, Esq. (92364)

WHITTAKER LAW, LLC

2055 Reading Road, Suite 260

Cincinnati, Ohio 45202

(513) 457-5545

(513) 436-0698 Fax

Justin@WhittakerLawFirm.com

**Counsel for Plaintiff Logan Imber**

## JURY DEMAND

Plaintiff reiterates her demand for a jury trial on all issues so triable.

*/s/Justin M. Whittaker*_____

Justin M. Whittaker, Esq. (92364)